## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **MARY A. WRIGHT,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:06cv00011 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,**[1] | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

### I. Background and Standard of Review

Plaintiff, Mary A. Wright, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq.* (West 2003 & Supp. 2006). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517

---

[1]Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, and is, therefore, substituted for Jo Anne B. Barnhart as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d)(1).

-1-

(4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Wright  protectively filed her applications for DIB and SSI on or about May 21, 2003. (Record, ("R."),at 53-56, 449-51.) She alleged disability as of January 31, 2003, due to congestive heart failure and emphysema. (R. at 53, 83, 449.) Wright's claims were denied both initially and on reconsideration. (R. at 39-41, 44, 45-47,456-58.) Wright then requested a hearing before an administrative law judge, ("ALJ"). (R. at 48.) The ALJ held a hearing on November 18, 2004, at which Wright was represented by counsel. (R. at 521-47.)

By decision dated January 11, 2005, the ALJ denied Wright's claims. (R. at 19-30.) The ALJ found that Wright met the nondisability insured status requirements of the Act for DIB purposes through the date of the decision. (R. at 29.) The ALJ found that Wright had not engaged in substantial gainful activity since the alleged onset date. (R. at 29.) The ALJ also found that the medical evidence established that Wright had severe impairments, namely chronic obstructive pulmonary disease, ("COPD"), and congestive heart failure, but he found that Wright did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 26, 29.) The ALJ further found

that Wright's allegations regarding her pain and symptoms were not totally credible. (R. at 29.) The ALJ found that Wright retained the residual functional capacity to perform medium[2] work that did not require her to work around dust or other respiratory irritants or exposure to temperature extremes and work consistent with an emotional disorder imposing no significant restrictions. (R. at 30.) The ALJ found that Wright could not perform her past relevant work. (R. at 30.) Based on Wright's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ concluded that Wright could perform jobs existing in significant numbers in the national economy, including those of a cashier, an inventory clerk, a hand packer, a child care worker, a laborer and an assembler. (R. at 30.) Thus, the ALJ found that Wright was not disabled under the Act and was not eligible for benefits. (R. at 30.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2006).

After the ALJ issued his decision, Wright pursued her administrative appeals, (R. at 14-15), but the Appeals Council denied her request for review. (R. at 8-11.) Wright then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2006). The case is before this court on Wright's motion for summary judgment filed June 6, 2006, and the Commissioner's motion for summary judgment filed July 10, 2006.

## II. Facts

Wright was born in 1961, (R. at 53, 524), which classifies her as a "younger

---

[2]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2006).

Case 1:06-cv-00011-JPJ-PMS   Document 16   Filed 02/28/07   Page 3 of 30   Pageid#: 81

person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). She has a high school education with two years of college. (R. at 89.) Wright has past relevant work experience as an x-ray technician, a stocker, a cook in a fast food restaurant and a medical examiner for a life insurance company. (R. at 84, 524-25.) At her hearing, Wright testified that she suffered from a variety of ailments including diabetes, seizures, lack of concentration, asthma, congestive heart failure, prehyperthyroidism, diverticulosis, sleep apnea and anxiety. (R. at 525-38.) She stated that her asthma had improved with medication, but that her blood sugar levels were difficult to control even with medication. (R. at 528, 536.) Wright testified that she was not seeing a mental health professional. (R. at 529.)

Robert S. Spangler, a vocational expert, also was present and testified at Wright's hearing. (R. at 540-46.) Spangler classified Wright's past work as an x-ray technician as between light[3] and medium and skilled, as a material handler as between medium and heavy[4] and unskilled, as a medical examiner as light and skilled and as a fast food cook as medium and semiskilled. (R. at 541.) Spangler was asked to consider a hypothetical individual of Wright's height, weight, education and work experience who had the residual functional capacity for medium work, but who must avoid working around dust or other respiratory irritants and temperature extremes due to a respiratory impairment. (R. at 541.) This individual also would have an

---

[3]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting and/or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2006).

[4]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting and/or carrying of items weighing up to 50 pounds. If someone can perform heavy work, she also can perform medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2006).

emotional disorder imposing no significant restrictions on her work-related abilities. (R. at 541.) Spangler testified that such an individual could perform jobs existing in significant numbers in the national economy, including those of a cashier, a postal mail carrier, an inventory clerk, a kitchen worker, a maid, a hand packer, a child care worker, a nonconstruction laborer and an assembler. (R. at 542-43.) Spangler, who has a background in psychology, further testified that it would be helpful to obtain objective testing to determine the extent of Wright's concentration and memory impairment. (R. at 543-44.) Spangler testified that an individual with the concentration difficulties as testified to by Wright would not be able to perform any jobs. (R. at 544.) Spangler testified that if an individual who had to be absent more than one day per month or an individual who had to take breaks in excess of two scheduled breaks and a lunch break would not be able to work. (R. at 545-46.)

In rendering his decision, the ALJ reviewed records from Midtown Medical Center; Dr. Joseph F. Smiddy, M.D.; Bristol Regional Medical Center; Outpatient Diagnostic Center; Dr. Frank M. Johnson, M.D., a state agency physician; Julie Jennings, Ph.D., a state agency psychologist; Howard S. Leizer, Ph.D., a state agency psychologist; Dr. Thomas J. Boeve, M.D.; Dr. Pierre Istfan, M.D.; Dr. Geoffrey Correll, M.D.; Bristol Surgery Center; Dr. Anthony Broglio, M.D.; and Dr. Roger McSharry, M.D. Wright's attorney submitted additional records from Midtown Medical Center; Sharon J. Hughson, Ph.D., a licensed clinical psychologist; and Med Express to the Appeals Council.[5]

---

[5]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 8-11.), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

Wright presented to the emergency department at Bristol Regional Medical Center, ("BRMC"), on April 17, 2000, with complaints of lower back pain after falling due to a syncopal episode. (R. at 175.) She reported other episodes of near syncope over the previous several weeks. (R. at 167.) An x-ray of the lumbar spine showed only mild levoscoliosis of the thoracolumbar spine. (R. at 171.) A CT scan of the head and a chest x-ray were normal. (R. at 169-70.) An electrocardiogram, ("EKG"), was normal. (R. at 167.) Wright was diagnosed with syncope and low back pain. (R. at 168.) On September 22, 2001, Wright again presented to the emergency department with complaints of chest pain and tightness, shortness of breath, stuttering and slurred speech. (R. at 163-66.) Weakness of the left upper extremity was noted, as well as generalized clonic shaking motions of all extremities. (R. at 164.) Wright's sensation was intact, and tendon reflexes were symmetric throughout. (R. at 164.) Dr. Earl K. Wilson, M.D., a neurologist, determined that there was no evidence of an ongoing stroke. (R. at 157.) She was diagnosed with acute chest pain and anxiety and was admitted to the hospital. (R. at 165.) While in the hospital, Dr. Donald Quinn, M.D., diagnosed her with chest pain, a transient neurological dysfunction and a history of panic disorder. (R. at 162.) She was prescribed Tofranil, which she stated she had taken in the past for panic disorder and which had helped her. (R. at 161.) A CT scan of the head was normal, as was a chest x-ray. (R. at 159-60.) Wright was discharged the following day with diagnoses of chest pain of questionable etiology, questionable panic disorder with transient neurological symptomatology, possibly secondary to hyperventilation, questionable depression/anxiety disorder and hypertension. (R. at 155.)

Wright again presented to the emergency department at BRMC on February 28,

-6-

2002, with complaints of right flank pain. (R. at 145-47.) A CT scan of the abdomen and pelvis revealed cysts in the right ovary. (R. at 149-50.) She was referred to an obstetrician/gynecologist, for further evaluation. (R. at 146.) On March 5, 2002, Wright saw Dr. Geoffrey Correll, M.D. (R. at 208-09.) A physical examination revealed a lipoma on the right side of the chest. (R. at 208.) Wright reported a rectocele[6] that was worsening. (R. at 208.) Dr. Correll noted that Wright's hypertension was under good control with medications. (R. at 208.) She was advised to lose weight and to stop smoking. (R. at 208.) On April 12, 2002, Wright underwent surgery to remove the lipoma and the ovarian cyst and to repair the rectocele. (R. at 143-44.)

On June 27, 2002, Wright again presented to the emergency department, complaining of right flank pain with suprapubic pain, frequency and urgency. (R. at 136-37.) A CT scan revealed no kidney stones. (R. at 138.) A chest x-ray showed no acute cardiopulmonary disease. (R. at 139.) Wright was diagnosed with a urinary tract infection with possible early pyelonephritis.[7] (R. at 137.) On October 22, 2002, and again on February 12, 2003, Wright was diagnosed with bronchitis. (R. at 201, 204.) Chest x-rays were normal. (R. at 227.) She was prescribed Avelox. (R. at 201.) On March 13, 2003, Wright was diagnosed with probable asthma. (R. at 199.) She was given samples of Combivent and Diovan. (R. at 199.) Pulmonary function tests were ordered and were performed by Dr. Roger J. McSharry, M.D., on March 21,

---

[6]A rectocele is a hernial protrusion of part of the rectum into the vagina. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 1436 (27th ed. 1988).

[7]Pyelonephritis refers to an inflammation of the kidney and pelvis due to a bacterial infection. *See* Dorland's at 1393.

2003. (R. at 199, 248-58.) Dr. McSharry diagnosed a trivial airflow obstruction. (R. at 248.) On March 24, 2003, Wright was diagnosed with dyspnea and was given samples of Protonix. (R. at 194.)

On March 26, 2003, Wright saw Dr. Joseph F. Smiddy, M.D., upon Dr. Correll's referral. (R. at 278-80.) Wright complained of right anterior lung discomfort associated with some slight tenderness. (R. at 278.) She reported experiencing a cough, shortness of breath and wheezing for the previous three weeks. (R. at 278.) She was diagnosed with bronchitis, hemoptysis and COPD. (R. at 280.) A bronchoscopy was performed on April 2, 2003, and Wright was again diagnosed with bronchitis. (R. at 280, 293.)

On May 21, 2003, Wright complained of a nonproductive cough and wheezing. (R. at 129-30.) A physical examination revealed expiratory wheezes in all lung fields with a few scattered upper airway rhonchi, mostly cleared with cough. (R. at 129.) A chest x-ray was normal. (R. at 132.) She received two Albuterol treatments, which resulted in fairly significant relief. (R. at 130.) Wright was diagnosed with acute exacerbation of asthma secondary to continued tobacco use, and she was prescribed Prednisone and Tylenol 3. (R. at 130.) On May 30, 2003, Dr. Correll noted bilateral diffuse wheezes. (R. at 191-92.) He again advised her to stop smoking. (R. at 192.) She was placed on Advair and Albuterol. (R. at 192.) On July 7, 2003, Dr. Correll noted that Wright had done "much, much better" since her medications had been changed. (R. at 190.) Wright reported that she had stopped smoking and was starting a regular exercise program. (R. at 190.) She was again diagnosed with COPD. (R. at 190.)

On July 9, 2003, Wright complained of swelling in her legs, hands and ankles for the previous several weeks. (R. at 119-20.) Wright further reported increased shortness of breath when lying flat. (R. at 119.) A physical examination revealed 1 to 2+ bilateral lower extremity edema. (R. at 119.) No focal motor or sensory deficits were noted. (R. at 120.) A chest x-ray showed no signs of congestive heart failure. (R. at 120, 122.) She received Albuterol treatments which helped her symptoms. (R. at 120.) Wright was diagnosed with COPD exacerbation and peripheral edema. (R. at 120.) The following day, Wright again presented to the emergency department with complaints of being very nervous and experiencing tingling around her mouth. (R. at 116-17.) She reported that she had just quit smoking. (R. at 116.) Wright was described as "quite anxious" with a consistent mental status (R. at 116.) No focal or lateralizing neurological deficits were noted, and Wright's reflexes were 2+ bilaterally and equal in all areas. (R. at 116.) She was diagnosed as having had an adverse reaction to medication. (R. at 117.) Wright was prescribed Vistaril for anxiety. (R. at 117.) On July 23, 2003, Wright reported pain in multiple joints for the previous several months. (R. at 188.) She was prescribed Vioxx and was again advised to lose weight with diet and exercise. (R. at 188.)

On August 3, 2003, Wright again presented to the emergency department at BRMC with complaints of chest tightness and shortness of breath the previous night. (R. at 318.) She was admitted to the hospital with a diagnosis of congestive heart failure exacerbation. (R. at 315.) Wright noted occasional anxiety and panic attacks. (R. at 316.) A chest x-ray was normal, as was an EKG. (R. at 313-14, 316.) Wright was diagnosed with atypical chest pain with associated dyspnea, dependent edema and hypertension. (R. at 317.) An EKG, taken on August 4, 2003, revealed a relaxation

abnormality of the left ventricle and borderline left ventricular wall thickness.  (R. at 308.)  Wright underwent an overnight sleep study, which revealed mild obstructive sleep apnea syndrome.  (R. at 301-07, 309.)  The following day, Wright saw Dr. Pierre Istfan, M.D., a cardiologist, for evaluation of her shortness of breath and chest tightness.  (R. at 296.)  She underwent a Cardiolite treadmill stress test, which yielded negative results.  (R. at 310-12.)  Dr. Istfan diagnosed congestive heart failure, chest pain of unclear etiology, hypokalemia/hypomagnesemia, hypotension and COPD.  (R. at 298.)  Wright was discharged on August 6, 2003, with diagnoses of congestive heart failure with diastolic dysfunction, chest pain, hypertension, hypomagnesemia, hypokalemia and asthma/COPD.  (R. at 294.)

On August 22, 2003, Wright again presented to the emergency department after falling after becoming weak.  (R. at 108-09.)  Wright's cranial nerves were intact, as were her motor and sensory functioning.  (R. at 108.)  Deep tendon reflexes were 2+ and symmetrical.  (R. at 108.)  A CT scan of the head was normal, as was a chest x-ray.  (R. at 108, 110.)  Although opiates were found in Wright's blood, she denied taking them.[8]  (R. at 109.)  Wright was advised to take ibuprofen for pain.  (R. at 109.)  On September 19, 2003, Wright complained of tachycardia and shortness of breath.  (R. at 184-85.)  Dr. Correll noted that although a chest x-ray taken in August was not remarkable for congestive heart failure, that the physician felt that she was clinically suffering from it.  (R. at 184.)  Dr. Correll noted minimal edema in the arms and legs.  (R. at 184.)  Wright was diagnosed with diastolic congestive heart failure, multiple joint pains, COPD and hypertension under incomplete control.  (R. at 185.)  She was referred to a cardiologist.  (R. at 185.)  On September 22, 2003, Wright reported

_____

[8]Wright later admitted taking a friend's Soma.  (R. at 185.)

-10-

feeling much better.  (R. at 183.)

On October 2, 2003, Wright underwent an overnight sleep study and was diagnosed with mild obstructive sleep apnea syndrome.  (R. at 247.)  Although a second night study was scheduled, it does not appear from the evidence contained in the record that this ever occurred.  On November 3, 2003, Wright presented with complaints of hypertension.  (R. at 182.)  A mass on the left side of her neck was noted.  (R. at 181.) A CT scan of the neck revealed scattered small nodes throughout the neck.  (R. at 229, 324.)  A CT scan of the pelvis was normal, as was a CT scan of the abdomen.  (R. at 230-31, 323, 325.)

On November 7, 2003, Wright complained of increased shortness of breath, numbness and tingling around the mouth and in the hands and chest tightness.  (R. at 102-03.)  A chest x-ray was normal, an EKG revealed a normal sinus rhythm, and a CT scan of the chest ruled out a pulmonary embolus.  (R. at 102, 104-05.)  Wright was diagnosed with acute exacerbation of bronchospasm that led to hyperventilation syndrome.  (R. at 103.)  On November 24, 2003, Wright complained of epigastric abdominal pain for the previous three days, worse at night.  (R. at 98-99.)  A physical examination revealed some midepigastric tenderness, but abdominal x-rays were normal.  (R. at 98, 100.)  After receiving a gastrointestinal cocktail, Wright obtained significant relief.  (R. at 98.)  She was diagnosed with likely peptic ulcer disease and was placed on Zantac.  (R. at 98.)

On December 2, 2003, Wright saw Dr. Thomas J. Boeve, M.D., at Dr. Correll's referral, for evaluation of her neck.  (R. at 360-62.)  Wright was diagnosed with

-11-

laryngopharyngeal reflux, palpable soft fullness and swelling in the left supraclavicular region and obstructive sleep apnea. (R. at 361.) Dr. Boeve opined that Wright had a very atypical bleb[9] or lipoma. (R. at 361.) She was placed on Nexium. (R. at 361.) An MRI of the neck, taken on December 8, 2003, was normal. (R. at 321.) Wright again saw Dr. Boeve on December 17, 2003. (R. at 358-59.) She was diagnosed with a lipoma, left auricular chondritis, laryngopharyngeal reflux and obstructive sleep apnea. (R. at 359.) A CT scan of the neck showed cervical nodes. (R. at 225.) She was given Levaquin and steroids. (R. at 359.) On January 6, 2004, Wright saw Dr. Istfan for a follow-up of her stress test. (R. at 366.) She reported feeling better. (R. at 366.) At that time, Dr. Istfan diagnosed congestive heart failure, well compensated, diastolic left ventricle dysfunction, hypertension, poorly controlled, and asthma. (R. at 366.) He prescribed Verapamil and advised her to lose weight and exercise regularly. (R. at 366.) On January 15, 2004, although Wright complained of a swollen right arm for the previous month, she exhibited a good range of motion. (R. at 180.) She was diagnosed with right arm swelling, likely related to a previous fall, and hypertension. (R. at 180.) Wright was given Darvocet. (R. at 180.) On January 19, 2004, the lipoma in Wright's neck was removed by Dr. Boeve without complication. (R. at 357, 387-88.)

On February 12, 2004, Dr. Frank M. Johnson, M.D., a state agency physician, completed a physical assessment, finding that Wright could perform medium work. (R. at 344-52.) He found that Wright could frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl, but that she could never climb ladders, ropes or scaffolds. (R. at 348.) Dr. Johnson imposed no manipulative, visual or communicative limitations. (R. at 348-49.) He found that Wright should avoid all

---

[9]A bleb is another name for a blister. *See* Dorland's at 214, 243.

exposure to fumes, odors, dusts, gases and poor ventilation. (R. at 350.)  These findings were affirmed by Dr. Richard M. Surrusco, M.D., another state agency physician, on March 16, 2004.  (R. at 347.)  The same day, Julie Jennings, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding that Wright suffered from a nonsevere anxiety-related disorder. (R. at 328-43.)  Jennings opined that Wright experienced only mild limitations in activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace.  (R. at 338.)  She further opined that there was insufficient evidence from which to determine whether Wright had suffered episodes of decompensation.  (R. at 338.)  Jennings found Wright's allegations partially credible.  (R. at 340.)

Chest x-rays taken on February 13, 2004, were normal.  (R. at 224.)  On March 15, 2004, Wright continued to complain of shortness of breath, difficulty sleeping at night and cold sweats.  (R. at 404.)  Danielle Overton, a family nurse practitioner for Dr. Correll, noted that Wright was wheezy and short of breath. (R. at 404.)  An examination revealed diffuse scattered rhonchi and wheezes throughout the lungs. (R. at 404.)  Wright was diagnosed with bronchitis and was referred to Dr. McSharry for further evaluation.  (R. at 404.)  A chest x-ray, taken on March 16, 2004, was normal. (R. at 443, 448.)  On March 19, 2004, although Wright complained of having swallowed a foreign object, x-rays of Wright's neck were normal.  (R. at 385, 447.) A physical examination by Dr. McSharry revealed no jugular venous distention or adenopathy in the neck.  (R. at 445.)  Wright was diagnosed with probable inflammation of the pharynx or upper esophagus without obstruction. (R. at 445.) On March 29, 2004, Wright was diagnosed with solid food dysphagia, hematochezia and

-13-

hypertension. (R. at 371-72.) An upper endoscopy and colonoscopy was recommended. (R. at 372.) Although a CT scan of the kidneys, taken on May 17, 2004, showed a calculus, subsequent laboratory testing revealed no urinary calculi. (R. at 415, 441.)

On July 14, 2004, Wright complained to Overton of shoulder and neck pain for the previous three days after lifting a dresser. (R. at 403.) An examination revealed tight right shoulder muscles, tenderness on palpation to the right shoulder, a good range of motion of the arms and no crepitus. (R. at 403.) Wright was diagnosed with right-sided neck and shoulder pain, probably muscle strain. (R. at 403.) Wright refused an x-ray, and she was prescribed Naprosyn and Norflex. (R. at 403.) On July 26, 2004, Wright complained of nearly passing out the previous day. (R. at 401.) She was diagnosed with subclinical hypothyroidism and a presyncopal episode. (R. at 401.) Overton noted that Wright's thyroid hormone stimulating, ("TSH"), level was elevated. (R. at 401.) She refused a referral to a neurologist. (R. at 401.)

On July 29, 2004, an MRI of Wright's brain showed diffuse abnormal signal. (R. at 430.) On August 3, 2004, Wright complained of slurred speech, weakness, facial aphasia and facial numbness. (R. at 429.) Another MRI of Wright's brain revealed similar findings. (R. at 429.) An echocardiogram showed left ventricular hypertrophy, right ventricular hypertrophy, an ejection fraction of 65 to 70 percent, minimal mitral regurgitation and mild tricuspid regurgitation and diastolic dysfunction of the left ventricle. (R. at 435.) It was noted that a psychiatric consultation had been requested. (R. at 436.) An electroencephalogram, ("EEG"), taken the following day, revealed mild encephalopathy. (R. at 428.) A chest x-ray was normal, as was a CT

-14-

scan of Wright's head.  (R. at 437-38.)  Another EEG was performed the following day, which revealed no epileptiform changes.  (R. at 427.)  Wright was discharged on August 6, 2004, with diagnoses of a speech disorder, probably functional, pseudoseizures, hypertension, hypertriglyceridemia and diastolic dysfunction.  (R. at 435.)

On August 16, 2004, Wright complained of what she described as seizures.  (R. at 399-400.)  She stated that she experienced an episode during which her eyes rolled back into her head, she was stuttering and shaking and had periods where she could not hear.  (R. at 399.)  She reported that the emergency room physician informed her that she had not had a seizure, but that her symptoms were psychological in nature.  (R. at 399.)  It was recommended that she see a psychiatrist, but Wright declined to follow up.  (R. at 399.)  An MRI showed that some parts of Wright's brain were possibly slightly swollen.  (R. at 399.)  Overton diagnosed possible seizures and recommended that she see a different neurologist for a second opinion.  (R. at 400.)  On September 2, 2004, Wright complained of rectal bleeding for several days with associated generalized lower abdominal pain.  (R. at 396-98.)  Dr. Correll noted that an anal fissure was likely the source of Wright's bleeding, which he opted to treat conservatively.  (R. at 397.)  Wright also was diagnosed with nonspecific abdominal pain, impaired glucose tolerance, ("IGT"), presyncopal episode, subclinical hypothyroidism, hypertension, poorly controlled, and mild sleep apnea.  (R. at 397-98.)  A CT scan of the abdomen and pelvis revealed fatty infiltration of the liver and diverticula in the sigmoid colon and descending colon without evidence of diverticulitis.  (R. at 377-78.)  The following day, an ultrasound of the kidneys was normal, with the exception of a cyst in the left kidney.  (R. at 376.)  Wright underwent

an endoscopy and colonoscopy which revealed a hiatal hernia and small internal hemorrhoids. (R. at 375.) She underwent another colonoscopy on May 6, 2004, and was diagnosed with hematochezia, likely from hemorrhoids or diverticula. (R. at 373-74.) She was advised to follow a high fiber diet and take a daily fiber supplement. (R. at 373.) On September 8, 2004, Wright complained of left upper quadrant pain and hematochezia. (R. at 368-69.) She was diagnosed with left upper quadrant pain that might be musculoskeletal or functional in nature. (R. at 369.) She was prescribed Donnatal. (R. at 369.)

On September 16, 2004, Wright reported that the rectal bleeding had resolved, but that she continued to experience some abdominal pain. (R. at 394.) She was again diagnosed with IGT, fatty liver disease, chronic abdominal pain, hypertension, poorly controlled, subclinical hypothyroidism, presyncopal episode, mild sleep apnea, panic attacks, COPD, multiple joint pain and diastolic congestive heart failure. (R. at 394-95.) On September 21, 2004, Wright was again diagnosed with IGT. (R. at 392.) She was advised to continue to diet and exercise and to check her blood sugars as much as she could. (R. at 392.) On October 6, 2004, Wright was diagnosed with diabetes and was prescribed Glucotrol. (R. at 391.) On October 20, 2004, Wright complained of left-sided upper chest and arm tightness with heart fluttering and racing. (R. at 389.) Her left shoulder was not tender to palpation, and she had a good range of motion. (R. at 389.) Wright was diagnosed with left upper chest, shoulder and arm tightness and was advised to follow up with Dr. Istfan. (R. at 389.) Overton noted that a lot of psychosomatic issues were involved in her complaints. (R. at 390.) She was again advised to follow up with her cardiologist. (R. at 390.)

-16-

Wright was again hospitalized from October 23, 2004, through October 25, 2004. (R. at 439-40.) She was diagnosed with a syncopal episode, psychiatric illness with anxiety and depression, fatty liver infiltration with nonalcoholic steatohepatitis,[10] increased TSH levels, a history of diabetes mellitus and hypertension. (R. at 439.) Abdominal and chest x-rays were normal. (R. at 409.) A CT scan of the abdomen and pelvis showed probable diffuse fatty infiltration of the liver, but otherwise was unremarkable. (R. at 407.) CT scans of the head and small bowel yielded normal results. (R. at 405-06.) Wright was advised to increase her daily exercise to 30 minutes. (R. at 439.) She was discharged in improved condition. (R. at 440.) On November 3, 2004, Wright's dosage of Glucotrol was increased. (R. at 463.) On December 6, 2004, Dr. Correll noted that Wright had a presyncopal episode in his office, which his nurse practitioner witnessed. (R. at 459.) He noted that it was not suggestive of true seizure activity. (R. at 459.)

On December 23, 2004, an MRI of Wright's brain was normal. (R. at 518.) On January 17, 2005, Wright was seen at Med Express with complaints of falling and striking her head. (R. at 514.) She reported that Lexapro and Klonopin had helped with her depression and anxiety. (R. at 514.) She was diagnosed with diabetes mellitus type II, depression and anxiety and hypothyroidism. (R. at 514.) She was treated with Glucophage, Lexapro and Klonopin. (R. at 514.)

Wright saw Sharon J. Hughson, Ph.D., a licensed clinical psychologist, on

---

[10]Nonalcoholic steatohepatitis is a liver inflammation caused by a buildup of fat in the liver. Although the cause of the condition is not known, it seems to be related to obesity, high cholesterol and triglycerides and diabetes. *See* http://www.webmd.com/digestive-disorders/tc/Nonalcoholic-Steatohepatitis-NASH-Overview.

-17-

January 28, 2005, for a psychological evaluation at her attorney's request. (R. at 465-68.) Wright reported crying three to four times a week for 20 minutes and feeling anxious easily. (R. at 465.) She attributed her psychological problems to her diabetes and never having received or sought psychological treatment. (R. at 466.) Hughson noted that Wright was fully oriented, and she denied homicidal or suicidal ideation. (R. at 466.) Although Wright denied difficulty relating to others, Huhgson noted she had difficulty relating to her. (R. at 467.) Wright reported driving, taking care of her personal hygiene, managing the family money, watching television, listening to the radio, shopping, cooking, performing housework, using the telephone, visiting others and receiving visits and accompanying her son to doctor's appointments. (R. at 467.) Wright stated that she enjoyed reading and "shooting baskets" with her son. (R. at 467.)

The Beck Depression Inventory, ("BDI"), indicated a mild to moderate level of depression. (R. at 467.) The Beck Anxiety Inventory, ("BAI"), indicated a moderate level of anxiety. (R. at 468.) Hughson diagnosed Wright with major depressive disorder, recurrent, mild, generalized anxiety disorder, somatoform disorder, not otherwise specified, and dependent personality disorder. (R. at 468.)

On February 1, 2005, Wright was diagnosed with hyperglycemia and was advised to monitor her glucose at home. (R. at 512.) On March 1, 2005, Wright saw Dr. Douglas P. Williams, M.D., a neurologist, for an evaluation after complaints of memory difficulty for the previous few months. (R. at 478.) Mental status testing was normal, and cranial nerves were intact. (R. at 478.) Muscle strength was symmetric bilaterally, and Wright's reflexes were +2/4. (R. at 478.) Dr. Williams opined that

-18-

Wright's memory difficulty might be related to sleep deprivation.  (R. at 478.)  He prescribed Restoril.  (R. at 478.)

On March 6, 2005, Hughson also completed a mental assessment, finding that Wright had a good ability to follow work rules, to relate to co-workers, to deal with the public, to function independently and to understand, remember and carry out simple job instructions.  (R. at 469-70.)  She found that Wright had a fair ability to interact with supervisors, to maintain attention and concentration, to understand, remember and carry out detailed job instructions and to maintain personal appearance.  (R. at 469-70.)  In all other areas of adjustment, Hughson found that Wright had poor or no abilities.  (R. at 469-70.)

On April 26, 2005, Wright's affect was described as flat.  (R. at 503.)  On June 10, 2005, she complained of right hip pain and night sweats.  (R. at 498.)  She was diagnosed with acute right hip pain, sleep apnea and diabetes mellitus type II and was advised to take Naprosyn, Norflex and Ultram.  (R. at 498.)  On June 29, 2005, Wright's daughter called Med Express with concerns that Wright was taking too much medication.  (R. at 494.)  She described her as a "zombie and spaced out."  (R. at 494.)  She stated that Wright had been sleeping from 10:00 p.m. until 5:00 p.m. for the previous month.  (R. at 494.)  On July 11, 2005, Wright noted that she slept "all the time," noting that she slept more than 18 hours each day.  (R. at 492.)  She further reported that she had gone to jail for shoplifting and that a psychological evaluation had been performed the previous week.[11]  (R. at 492.)  Wright also reported that she was addicted to Robitussin DM.  (R. at 492.)  She was diagnosed with severe

[11]This psychological evaluation is not contained in the record.

depression. (R. at 492.) On July 28, 2005, Wright was prescribed Klonopin. (R. at 488.) On August 2, 2005, she again reported being dizzy and falling down the previous four days. (R. at 486.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2006).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*,

-20-

658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated January 11, 2005, the ALJ denied Wright's claims. (R. at 19-30.) The ALJ found that the medical evidence established that Wright had severe impairments, namely COPD and congestive heart failure, but he found that Wright did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 26, 29.) The ALJ found that Wright retained the residual functional capacity to perform medium work that did not require her to work around dust or other respiratory irritants or exposure to temperature extremes and work consistent with an emotional disorder imposing no significant restrictions. (R. at 30.) Based on Wright's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ concluded that Wright could perform jobs existing in significant numbers in the national economy. (R. at 30.) Thus, the ALJ found that Wright was not disabled under the Act and was not eligible for benefits. (R. at 30.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2006).

In her brief, Wright argues that the ALJ erred in his residual functional capacity finding. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 14-15.) Wright also argues that the ALJ erred by failing to find that she suffered from a severe mental impairment. (Plaintiff's Brief at 15-22.) Finally, Wright argues that the case must be remanded for the consideration of new evidence. (Plaintiff's Brief at 21-22.)

As stated above, the court's function in this case is limited to determining

-21-

whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Wright argues that the ALJ erred by finding that she retained the residual functional capacity to perform medium work that did not require work around dust or other respiratory irritants or exposure to temperature extremes and work consistent with an emotional disorder imposing no significant restrictions. (Plaintiff's Brief at 14-15.) For the following reasons, I find that substantial evidence supports the ALJ's finding with regard to Wright's physical residual functional capacity, but, for the reasons discussed below in connection with Wright's remaining arguments, I find that substantial evidence does not support the ALJ's finding with regard to Wright's mental residual functional capacity.

Specifically, Wright contends that the ALJ erred by failing to assess her work-related abilities on a function-by-function basis as required by Social Security Ruling 96-8p.[12] I first note that the Fourth Circuit has held that Social Security Rulings are interpretations by the Social Security Administration of the Social Security Act that

---

[12]SSR 96-8p states, in relevant part, as follows: "The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis. ..."

do not have the force of law, but are entitled to deference unless they are clearly erroneous or inconsistent with law. *See Pass v. Chater*, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995). Title 20 C.F.R. § 404.1545 states that, when assessing physical abilities, "we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis." Likewise, Title 20 C.F.R. § 404.1545 further states that, when assessing mental abilities, "we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis." Thus, the regulations do not require the ALJ to explicitly state in his decision a function-by-function analysis as Wright seems to argue. That being the case, I find that SSR 96-8p is inconsistent with the regulation and, therefore, is not entitled to deference. *See Pass*, 65 F.3d at 1204 n.3. Thus, the ALJ need not specifically address a claimant's work-related abilities on a function-by-function basis.

Moreover, just as the Fourth Circuit held in *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006), that the ALJ's residual functional capacity finding implicitly contained a finding that the claimant could work an eight-hour workday,[13] I find that an ALJ's residual functional capacity finding can implicitly contain a finding that the claimant's functions were analyzed separately in reaching that residual functional

---

[13]SSR 96-8p states, in relevant part, that "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p continues to define "regular and continuing basis" as "8 hours a day, for 5 days a week, or an equivalent work schedule." In *Hines*, the Fourth Circuit held that the ALJ's finding that the claimant had the residual functional capacity "to perform a wide range of sedentary work with limitations to working in temperature extremes, working at a production rate, or performing more than simple, routine, repetitive tasks," implicitly contained a finding, in light of SSR 96-8p, that Hines was physically able to work an eight-hour day. 453 F.3d at 563.

capacity determination, especially as in a case like the one currently before the court where it is evident from the ALJ's decision that he thoroughly reviewed the evidence and resulting limitations before making his residual functional capacity determination. Of course, substantial evidence still must exist to support the ALJ's residual functional capacity finding.

Based on my review of the record, I find that substantial evidence exists to support the ALJ's physical residual functional capacity finding. It is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). "Thus it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the [Commissioner] if his decision is supported by substantial evidence." *Hays*, 907 F.2d at 1456.

I first note that, in his decision, the ALJ thoroughly reviewed the evidence of record before reaching his physical residual functional capacity determination. In fact, he analyzed each of Wright's impairments and any resulting limitations before stating why they did or did not constitute severe impairments. As the Commissioner notes in his brief, the ALJ also stated in his decision that he had considered the entire record before making his residual functional capacity determination. (R. at 27.)

I next find that the ALJ's physical residual functional capacity finding is supported by the objective evidence of record. For instance, despite Wright's allegations of multiple impairments, diagnostic testing consistently yielded normal

results.  Multiple x-rays of the chest were, for the most part, normal, as was a Cardiolite treadmill stress test.  (R. at 102, 104-05, 108, 110, 139, 159-60, 169-70, 224, 310-14, 316, 409, 437.)  An EKG taken on August 4, 2003, did reveal a relaxation abnormality of the left ventricle and borderline left ventricular wall thickness.  (R. at 308.)  However, several EKGs were normal, and a CT scan of the chest ruled out a pulmonary embolus.  (R. at 102, 104-05, 167, 313-14, 316.)  Although a CT scan of the kidneys appeared to show a calculus, subsequent laboratory testing revealed otherwise.  (R. at 415, 441.)  CT scans of the abdomen and pelvis showed only a right ovarian cyst and fatty infiltration of the liver and diverticula in the sigmoid colon.  (R. at 138, 149-50, 230-31, 323, 325, 377-78, 404.)  Abdominal x-rays were normal.  (R. at 98, 100.)  Pulmonary function testing revealed a trivial airflow obstruction, and an overnight sleep study revealed only mild obstructive sleep apnea.  (R. at 247-48.)  Several CT scans of the head yielded normal results.  (R. at 108, 110, 159-60, 167-70, 405-06.)  X-rays of the spine showed only mild findings.  (R. at 171.)  MRIs and an EEG of the brain revealed possible slight swelling and mild encephalopathy.  (R. at  399, 428-30.)  Another EEG of the brain showed no epileptiform changes.  (R. at 427.)  A CT of the small bowel yielded normal results, and an ultrasound of the kidneys showed a cyst.  (R. at 376, 405-06.)

Findings on physical examinations also were consistently relatively mild, and Wright was advised to lose weight and stop smoking and was treated conservatively with medications.  Further, Wright reported on several instances that her various impairments were helped with medication.  (R. at 98, 120, 130, 190, 208, 514, 536.)  It is well-settled that "if a symptom can be reasonably controlled by medication or treatment, it is not disabling."  *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

-25-

Further, on January 6, 2004, Dr. Istfan stated that Wright's congestive heart failure was well-compensated. (R. at 366.) I also note that, importantly, none of the medical sources contained in the record placed any restrictions on Wright due to her physical impairments.

The ALJ's physical residual functional capacity assessment also is supported by Wright's self-reported activities, including driving, getting her son ready for school, preparing meals for herself and her son, performing housework such as washing dishes, doing laundry, making beds, vacuuming, dusting and mopping, reading, watching television, attending church services weekly, grocery shopping, cross-stitching and playing with her grandson. (R. at 73-79.) Wright reported that she did not require assistance going places, with personal hygiene or attending to her finances. (R. at 73-79.) Finally, I note that the ALJ's physical residual functional capacity finding is supported by the state agency physicians' opinions that Wright could perform medium work that did not require exposure to fumes, odors, dusts, gases and poor ventilation.[14] (R. at 345, 350.)

For all of these reasons, I find that substantial evidence exists to support the ALJ's physical residual functional capacity finding.

---

[14]I point out that although the state agency physicians also found that Wright could never climb ladders, ropes or scaffolds, (R. at 348), the ALJ did not specifically include this limitation in his residual functional capacity finding. Nonetheless, because the ALJ asked the vocational expert to consider the limitations contained in the state agency physicians' assessment, I find that the vocational expert's testimony that such an individual could perform jobs existing in significant numbers in the national economy constitutes substantial evidence upon which the ALJ may rely in making his disability determination.

Next, I find Wright's argument that the case should be remanded for the consideration of new evidence misplaced. Here, the new evidence to which Wright refers was, in fact, submitted to the Appeals Council. However, after considering this evidence, the Appeals Council denied Wright's request for review, finding that the new evidence provided no basis for changing the ALJ's decision. (R. at 8-11.) Moreover, as noted previously, because the Appeals Council considered this evidence, it also must be considered by this court. *See Wilkins*, 953 F.2d at 96. That being the case, I find that the case need not be remanded for the consideration of this evidence.

With regard to Wright's final argument, that the ALJ erred by failing to find that she suffered from a severe mental impairment, I agree. The Social Security regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. §§ 404.1521(a), 416.921(a) (2006). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. §§ 404.1521(b), 416.921(b) (2006). The Fourth Circuit held in *Evans v. Heckler*, that, "[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)) (emphasis in original).

-27-

I find that substantial evidence does not support the ALJ's finding that Wright did not suffer from a severe mental impairment. Wright contends that, even if she does not have any one severe mental impairment, when all of her impairments are considered in combination as required by the regulations, she is disabled. It is well-settled that in order to determine "whether an individual's impairments are of sufficient severity to prohibit basic work related activities, an ALJ must consider the combined effect of a claimant's impairments." *Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir. 1989) (per curiam) (citing *Reichenbach v. Heckler*, 808 F.2d 309, 312 (4th Cir. 1985)); *see also* 20 C.F.R. §§ 404.1523, 416.923 (2006). Additionally, "the ALJ must adequately explain his or her evaluation of the combined effect of impairments." *Hines*, 872 F.2d at 59 (citing *Reichenbach*, 808 F.2d at 312). I find that, while the ALJ considered each of Wright's impairments thoroughly, he made no finding that the combination of Wright's impairments were or were not disabling as required by the regulations. That being the case, I recommend remanding the case for the ALJ to make specific findings regarding the combination of Wright's impairments and the resulting impact on her ability to perform work-related mental activities.

I further note that the record contains evidence from multiple physicians on multiple occasions suggesting that Wright suffers from psychiatric or psychological problems severe enough to manifest themselves in physical symptoms, such as anxiety attacks and pseudoseizures. It does not appear that the ALJ considered this evidence in his finding that she did not suffer from a severe mental impairment.

## PROPOSED FINDINGS OF FACT

-28-

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence exists to support the ALJ's finding with regard to Wright's physical residual functional capacity;

2.  Substantial evidence does not exist to support the ALJ's finding that Wright did not suffer from a severe mental impairment; and

3.  Substantial evidence does not exist to support the ALJ's finding that Wright was not disabled under the Act and was not entitled to benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Wright's motion for summary judgment, deny the Commissioner's motion for summary judgment, vacate the Commissioner's decision denying Wright benefits and remand the case to the Commissioner for further consideration of Wright's mental residual functional capacity and resulting ability to work.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(c) (West 2006):

Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file

-29-

written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:      This 28th day of February 2007.


/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE